

RECEIVED

2013 JUL 19  AM 8: 18

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

JOEL SMITH and
FLORIDA CARRY, INC., a
Florida Not-For Profit Corporation,

     Plaintiffs,

v.

DEPUTY ANDY COX; SERGEANT DAVE FIELDS;
SHERIFF JEFFREY DAWSY; and
CITRUS COUNTY, a political subdivision of the
State of Florida,

     Defendants.

_____/

*5:13-cv-347-OC- 10PRL*

Case No.:

Judge:

## COMPLAINT

COMES NOW the Plaintiffs, JOEL SMITH, and FLORIDA CARRY, INC.,

by and through their undersigned counsel, and sues Defendants, DEPUTY ANDY

COX, Individually, SERGEANT DAVE FIELDS, Individually, SHERIFF

JEFFREY DAWSY, Individually, and CITRUS COUNTY and states:

## INTRODUCTORY STATEMENT

1. This is an action for damages sustained by a citizen of the United States

   against CITRUS COUNTY, Florida, employee Sheriff's Deputy of Citrus

   County, and employee Sheriff's Sergeant of Citrus County. Deputy Andy

Cox used unnecessary force and abusive language without justification and in violation of Plaintiff's civil rights. Plaintiff brings suit against Sergeant Dave Fields as the supervisory officer responsible for the conduct, training and supervision of Sheriff Deputies under his charge. Defendant Dave Fields failed to properly train Sheriff Deputies in the appropriate methods of detaining and arresting suspected citizens, and to adequately discipline and supervise deputies in regards to their propensity to commit excessive force against the citizenry and to have appropriate policies, procedures, and practices in place in regards to the appropriate methods of detaining individuals during traffic stops. Plaintiff brings an action against Citrus County, Florida as the ultimate policy maker for the Citrus County Sheriff's Office.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution and the laws of the State of Florida.

3. The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331 and 1342(a)(3) and the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a).

4. Venue is placed in the United States District Court for the Middle District of Florida because it is where all parties reside and where the events complained occurred.

5. All conditions precedent to the maintenance of this action has been performed or has occurred prior to its institution.

6. Exhaustion of state administrative remedies is not a prerequisite to bringing a § 1983 action. Patsy v. Board of Regents, 457 U.S. 496, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982).

7. In an attempt to avoid uncertainty and to provide a workable analysis for determining the applicable statute of limitations in § 1983 claims, the Supreme Court held that the most appropriate statute of limitations for all § 1983 actions is the personal injury statute of limitations of the state whose law is to be applied. Wilson v. Garcia, 471 U.S. 261, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985).

8. Under Section 95.11 of the Florida Statutes, an action for a general personal injury claim has a statute of limitations for four years.

## PARTIES

9. At all times material hereto JOEL SMITH is a resident of Citrus County and at all times relevant hereto was *Sui Juris* (hereinafter "SMITH").

10. Plaintiff, Florida Carry, Inc. is a Florida Not-for Profit Corporation with a principal place of business located at 1090 Wild Holly Drive, Port Orange, Florida 32129.

11. Defendant, Citrus County (hereinafter "COUNTY"), is a political subdivision of the State of Florida, a Florida municipal corporation, and, at all times relevant hereto, it employed Defendant Deputy ANDY COX and Sergeant DAVE FIELDS in the Citrus County Sheriff's Office.

12. At all times relevant hereto and in all actions described herein, Defendant, Deputy Andy Cox (hereinafter "COX"), was acting under color of law as a Sheriff's Deputy, and in such capacity, as the agent, servant and employee of the Defendant, COUNTY.

13. At all times relevant hereto, Defendant, DAVE FIELDS (hereinafter "FIELDS"), was Sergeant of the Citrus County Sheriff's Office. As such, he was the commanding officer of Defendant Cox, and was responsible for his training, supervision and conduct. He was also responsible for enforcing the regulations of the Sheriff Office and for ensuring that the deputy personnel of the office obey the laws of the State of Florida and the United States of America. At all times relevant hereto, Defendant, FIELDS, was acting in such capacity as the supervisor of COX for Defendant COUNTY.

## FACTUAL ALLEGATIONS

14. On July 21, 2009, SMITH was driving his van on US Highway 19 off Miss Maggie Drive in Homosassa, Florida.

15. Cox was driving in the opposite direction on Miss Maggie and recognized SMITH's van as a vehicle that was allegedly involved in drug activity in the area.

16. COX decided to make a U-turn to get behind SMITH's van.

17. Once behind SMITH's van, COX followed SMITH's van because he had seen his van before outside of an area where COX believed drug activity was taking place. COX explained in his Internal Affairs interview on January 15, 2013, that he believed that a house, near where the van was usually parked, was manufacturing methamphetamines. Cox again explained in his Internal Affairs interview that the suspected house was eventually searched, but nothing concrete was found to build a case based on COX's assumption. (See Internal Affairs interview attached as Exhibit "A").

18. While behind SMITH's van, COX noticed the tag of the van had an expired decal.

19. COX then ran the tag (538LRK) through the Law Enforcement "Premier" Program and "DAVID" (Driver and Vehicle Information Database).

20. In the Internal Affairs interview, COX explains that the computer in his police car froze and he had to use teletype to run the tag number.

21. In the Internal Affairs interview, COX explains that he followed the van for a short while because he wasn't sure if he was going to stop it.

22. In the Internal Affairs interview, COX explains he was going to wait until he found out if the tag was valid first because he was going to try to work the traffic stop into a vehicle search.

23. In the Internal Affairs interview, COX explains that if it was just an expired display sticker/decal and the van had a valid tag that he probably wouldn't be able to get the necessary probable cause to work it into a search of the van.

24. At about 2:20 p.m. COX initiated a traffic stop on SMITH at the north end of a Walgreen's parking lot.

25. In the Internal Affairs interview, COX explains that the dash cam on his police vehicle automatically turns on once he turns his blue police lights on.

26. There is a twenty-one minute video and also a six minute condensed video of the entire traffic stop and arrest of SMITH in the possession of counsel.

27. The dash cam video starts off with COX behind SMITH's van at a red light, right before COX initiates the traffic stop.

28. Once SMITH is pulled over the video shows COX walking up to the driver's side door of the van.

29. As COX is approaching the van, SMITH steps out of the vehicle in a friendly manner to greet the officer.

30. COX introduces himself to SMITH and asks SMITH if he had his driver license on him.

31. SMITH complies with COX's request and reaches in his back pocket to retrieve his wallet.

32. COX then notifies SMITH that he stopped him because his tag expired and then corrects himself and tells him because the decal on the tag was expired.

33. COX then asks for registration and proof of insurance.

34. SMITH then friendly notifies COX that he has a valid decal sticker and that he had forgotten to put it on the tag.

35. SMITH follows COX's instructions and goes to retrieve his registration and proof of insurance.

36. As SMITH is reaching for his information his shirt rises up and a holster is revealed on his right hip.

37. But for SMITH following the lawful command of OFFICER COX, the holster would never have come into plain sight.

38. At no time is the handle, butt, or any part of the gun visible to COX. Only the holster is visible.

39. At this point COX loses control of his emotions, panics, and becomes irate and abusively yells at SMITH to put his hands on the van or he will shoot him in the "FUCKING" back.

40. At all times material hereto, SMITH was in control of his emotions.

41. COX continues to berate SMITH and tells him to not "FUCKING" move.

42. At all times material hereto, SMITH cooperated.

43. COX then commands SMITH to get down on the "FUCKING" ground.

44. At all times material hereto, SMITH cooperated and provided no resistance.

45. SMITH tries to explain himself and COX again yells at him to get down on the ground.

46. SMITH complies with COX's every command and at no time was he acting in a threatening manner.

47. SMITH lies down on the pavement and COX yells at him to put his hands behind his back, to which SMITH complies.

48. COX then yells at SMITH again not to move while SMITH is lying face down on the payment.

49. COX then handcuffs SMITH while SMITH explains to him that he has a permit to carry the weapon.

50. COX replies with "I don't care if you have a permit or not".

51. COX then has SMITH's wife exit the vehicle and walk around to the front of the van.

52. COX then asks SMITH's wife if she has any weapons and pats her down.

53. COX then tells SMITH that he never told him he had a permit, which is not required by SMITH.

54. In the video you can see that at no time was SMITH ever a threat to COX and in fact SMITH was very friendly and cooperative with him.

55. Cox then tells SMITH that everything is on video and we'll go to court on it.

56. COX then tells SMITH that he saw his gun pop out of his shirt and that is a violation of his concealed carry permit. When in fact all COX saw was the holster and not the gun.

57. COX then tells SMITH that he is being arrested for displaying a firearm and places him in the back of his Sheriff's vehicle.

58. At this time officer safety is no longer an issue.

59. In the Internal Affairs interview, COX explains that after SMITH is placed in the back of the Sheriff's vehicle, COX searches SMITH's van for weapons.

60. SMITH went to court and the charges were dismissed.

## COUNT I

**(Violation of Civil Rights While Acting Under The Color of Law 42 U.S.C. § 1983 – Against Defendant COUNTY on behalf of SMITH)**

61. SMITH realleges and reincorporates paragraphs 1-60 herein by reference.

62. This cause of action is brought by SMITH against Defendant COUNTY, for deprivation by its agents, servants, or employees namely, Defendants COX and FIELDS, of constitutional rights within the meaning of 42 U.S.C § 1983.

63. Defendant, COX, was acting under the color of law, as an authorized agent of Defendant COUNTY, while arresting SMITH in the furtherance of their duties.

64. The constitutional deprivation was caused by Defendant COUNTY's numerous areas of deliberate indifference including:

a) Failure to have deputies appropriately trained in the proper procedure for dealing with traffic stops that turn into possible scenarios for arrest.

b) Failure to have deputies appropriately trained in the proper procedure for dealing with stressful situation.

c) Failure to have deputies appropriately trained in the proper procedure for handling an arrest.

d) Failure to have deputies appropriately trained in the proper procedure of dealing with a threat assessment.

e) Failure to have deputies appropriately trained in the proper procedure of dealing with unexpected circumstances.

f) Failure to have deputies appropriately trained in the proper procedure for handling situations involved with weapons.

g) Failure to discipline COX after complaints were immediately made to the Sheriff's Office. Due to this failure

to discipline officers this informs officers in the office that they are secure in knowing that a reported incident will not result in any disciplinary proceedings.

65. The above described actions of COX, the policies of the Defendant COUNTY and the practices condoning the use of excessive force while agents, servants, or employees of Defendant COUNTY, deprive SMITH of rights and privileges under the Fourth and Fourteenth Amendments of the United States Constitution.

66. Defendant COX violated SMITH's civil rights, while under the color of law, by using methods and force that was grossly disproportionate in relation to the need for action.

67. As a direct and proximate result of the above-mentioned unconstitutional acts of COX, while an agent, servant, or employee of Defendant COUNTY, the unconstitutional policies, customs and practices of Defendant COUNTY, SMITH was deprived of his civil rights through abusive conduct, humiliation, and mistreatment.

WHEREFORE, Plaintiffs, hereby asks this Honorable Court to grant the following relief against the Defendant COUNTY:

A.    Award compensatory damages,

B.    Award reasonable attorney's fees and costs pursuant to 42 U.S.C. §

1988; and

C.    Award such other and further relief as this Honorable Court deems

just and proper.

## COUNT II

**(Violation of Civil Rights While Acting Under The Color of Law 42 U.S.C. §**

**1983 – Against Defendant FIELDS, Individually on behalf of SMITH)**

68. SMITH realleges and reincorporates paragraphs 1-60 herein by

reference.

69. This cause of action is brought by SMITH, against Defendant, FIELDS,

for deprivation of constitutional rights within the meaning of 42 U.S.C.

§ 1983.

70. Defendant FIELDS was the Sergeant for the Citrus County Sheriff's

Office and as such was responsible for the implementation and

promulgation of official policy over his subordinates.

71. FIELDS was deliberately indifferent to the need for adequate training

and supervision for his subordinates, the failure of which caused

constitutional violations upon the citizenry in general and SMITH in

particular.

72. The constitutional deprivations caused by FIELD's numerous areas of deliberate indifference include:

    a) Failure to have subordinates appropriately trained in the proper procedure for dealing with traffic stops that turn into possible scenarios for arrest.

    b) Failure to have subordinates appropriately trained in the proper procedure for dealing with stressful situation.

    c) Failure to have subordinates appropriately trained in the proper procedure for handling an arrest.

    d) Failure to have subordinates appropriately trained in the proper procedure of dealing with threat assessment.

    e) Failure to have subordinates appropriately trained in the proper procedure of dealing with unexpected circumstances.

    f) Failure to have subordinates appropriately trained in the proper procedure for handling situations involved with weapons.

    g) Failure to discipline COX after complaints were immediately made to the Sheriff's Office. Due to this failure to discipline subordinates this informs officers under his

supervision that they are secure in knowing that a reported incident will not result in any disciplinary proceedings.

73. As a direct and proximate result of the above-mentioned unconstitutional acts of FIELDS, while an agent, servant, or employee of Defendant COUNTY, the unconstitutional policies, customs and practices of Defendant COUNTY, SMITH was deprived of his civil rights through abusive conduct, humiliation, and mistreatment.

WHEREFORE, Plaintiffs, hereby asks this Honorable Court to grant the following relief against the Defendant FIELDS:

A.      Award compensatory damages,

B.      Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

C.      Award such other and further relief as this Honorable Court deems just and proper.

## COUNT III

**(Violation of Civil Rights While Acting Under The Color of Law 42 U.S.C. § 1983 – Against Defendant DAWSY, Individually on behalf of SMITH)**

74. SMITH realleges and reincorporates paragraphs 1-60 herein by reference.

75. This cause of action is brought by SMITH, against Defendant, DAWSY, for deprivation of constitutional rights within the meaning of 42 U.S.C. § 1983.

76. Defendant DAWSY was the Sergeant for the Citrus County Sheriff's Office and as such was responsible for the implementation and promulgation of official policy over his subordinates.

77. DAWSY was deliberately indifferent to the need for adequate training and supervision for his subordinates, the failure of which caused constitutional violations upon the citizenry in general and SMITH in particular.

78. The constitutional deprivations caused by DAWSY's numerous areas of deliberate indifference include:

    a) Failure to have subordinates appropriately trained in the proper procedure for dealing with traffic stops that turn into possible scenarios for arrest.

    b) Failure to have subordinates appropriately trained in the proper procedure for dealing with stressful situation.

    c) Failure to have subordinates appropriately trained in the proper procedure for handling an arrest.

d) Failure to have subordinates appropriately trained in the proper procedure of dealing with threat assessment.

e) Failure to have subordinates appropriately trained in the proper procedure of dealing with unexpected circumstances.

f) Failure to have subordinates appropriately trained in the proper procedure for handling situations involved with weapons.

g) Failure to discipline DAWSY after complaints were immediately made to the Sheriff's Office. Due to this failure to discipline subordinates this informs officers under his supervision that they are secure in knowing that a reported incident will not result in any disciplinary proceedings.

h) As a direct and proximate result of the above-mentioned unconstitutional acts of DAWSY, while an agent, servant, or employee of Defendant COUNTY, the unconstitutional policies, customs and practices of Defendant COUNTY, SMITH was deprived of his civil rights through abusive conduct, humiliation, and mistreatment.

WHEREFORE, Plaintiffs, hereby asks this Honorable Court to grant the following relief against the Defendant DAWSY:

A.    Award compensatory damages,

B.    Award reasonable attorney's fees and costs pursuant to 42 U.S.C. §
1988; and

C.    Award such other and further relief as this Honorable Court deems
just and proper.

## COUNT IV

### (Violation of Civil Rights While Acting Under The Color of Law 42 U.S.C. § 1983 – Against Defendant COX, Individually on behalf of SMITH)

79. SMITH realleges and reincorporates paragraphs 1-60 herein by
reference.

80. This cause of action is brought by SMITH, against Defendant COX for
his willful, wanton, malicious, and abusive conduct under the color of
law that deprived SMITH of constitutionally protected rights under the
Fourth and Fourteenth Amendments of the United States Constitution.

81. Defendant COX violated Title 42 U.S.C. § 1983 by inflicting abusive
misconduct upon SMITH that was grossly disproportionate to the
behavior necessary to arrest SMITH in violation of his rights under the
Fourteenth Amendment of the United States Constitution.

82. Defendant COX, while acting in his capacity as a Sheriff's Deputy for COUNTY under the color of law, did willfully, maliciously and intentionally used abusive misconduct to arrest SMITH for an alleged traffic infraction.

WHEREFORE, Plaintiffs, hereby asks this Honorable Court to grant the following relief against the Defendant COX:

A.      Award compensatory damages,

B.      Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

C.      Award such other and further relief as this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

## COUNT V

## (Violation of Civil Rights While Acting Under The Color of Law 42 U.S.C. § 1983 – Against Defendant COX, Individually on behalf of SMITH)

83. SMITH realleges and reincorporates paragraphs 1-60 herein by reference.

84. This cause of action is brought by SMITH against Defendant COX, for his unreasonable search of SMITH's can while under the color of law that deprived SMITH of Constitutionally protected right under the Fourth and Fourteenth Amendments of the United States Constitution.

85. Under the Fourth Amendment, a person has the right to be free from an unreasonable search of his vehicle.

86. COX deprived SMITH of this Fourth Amendment right by: 1) searching SMITH's van; 2) in conducting the search; Cox acted intentionally; and 3) the search was unreasonable.

87. A person acts "intentionally" when the person acts with a conscious objective to engage in a particular conduct.

88. Chapter 790, Florida Statutes provides that Mrs. Smith may have a handgun in her van providing she is at least 18 years of age, she is not a "prohibited person," and the handgun is securely encased and not readily accessible for immediate use. If the handgun is securely encased and not readily accessible for immediate use, the handgun can be kept anywhere in the vehicle.

If the firearm is a shotgun or rifle, and being carried for lawful use, it can be kept anywhere in the vehicle, including laying on the back seat of the vehicle does not furnish probable cause for an arrest, and OFFICER

COX had no reason to believe any weapon found during the search was being carried for the commission of a crime.

It is a well-settled exception to the warrant requirement that a police officer may search incident to an arrest both the arrested person and the area within the person's "immediate control"; i.e., "the area from within which [the person] might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). Thus, a search incident to the arrest of an occupant of a vehicle may extend to the entire passenger compartment of a vehicle, as well as any containers within it. *United States v. Mayo*, 394 F.3d 1271, 1277 (9th Cir. 2005) (citing *New York v. Belton*, 453 U.S. 454, 460 (1981)).

In *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009), however, the Supreme Court limited the circumstances when *Chimel* and *Belton* would justify a warrantless search of a vehicle incident to the arrest of a recent occupant:

> Under *Chimel*, police may search incident to arrest only
> the space within an arrestee's "immediate control,"
> meaning "the area from within which he might gain
> possession of a weapon or destructible evidence." The

> safety and evidentiary justifications underlying *Chimel's*
> reaching-distance rule determine *Belton's* scope.
> Accordingly, we hold that *Belton* does not authorize a
> vehicle search incident to a recent occupant's arrest after
> the arrestee has been secured and cannot access the
> interior of the vehicle....[W]e also conclude that
> circumstances unique to the automobile context justify a
> search incident to arrest when it is reasonable to believe
> that evidence of the offense of arrest might be found in
> the vehicle.

Id. At 129 S. Ct. 1714 The Court held:

> Police may search a vehicle incident to a recent
> occupant's arrest only if the arrestee is within reaching
> distance of the passenger compartment at the time of the
> search or it is reasonable to believe the vehicle contains
> evidence of the offense of arrest.  When these
> justifications are absent, a search of an arrestee's vehicle
> will be unreasonable unless police obtain a warrant or
> show that another exception to the warrant requirement
> applies.

89. Defendant COX, while acting in his capacity as a Sheriff's Deputy for

COUNTY under the color of law, unreasonably searched SMITH's van.

WHEREFORE, Plaintiffs, hereby asks this Honorable Court to grant the

following relief against the Defendant COX:

A.     Award compensatory damages,

B.     Award reasonable attorney's fees and costs pursuant to 42 U.S.C. §

1988; and

C.     Award such other and further relief as this Honorable Court deems

just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

## COUNT VI

## (Violation of Civil Rights While Acting Under The Color of Law 42 U.S.C. § 1983 – Against Defendant COX, Individually on behalf of SMITH)

90. SMITH realleges and reincorporates paragraphs 1-60 herein by

reference.

91. In committing the acts complained of herein, Defendant COX acted

under color of state law by falsely arresting and detaining SMITH with

no basis in fact or law to do so.

92. In violating SMITH's right to be free from false arrest, COX violated SMITH's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

93. It is alleged by COX that SMITH's gun was visible when SMITH reached into his van to retrieve his registration and proof of insurance.

94. Based on the video of the incident only SMITH's holster is visible when he reaches into his van.

95. In 2009, Florida Statutes 790.053 says it is unlawful for any person to openly carry on or about his or her person any firearm or electric weapon or device.

96. There is no mention in the Statute that it is unlawful to have a gun holster in open view.

97. In fact, the only time that a gun is visible in the video is when SMITH is commanded by COX to put his hands on the van or he will shoot him in the "fucking" back.

WHEREFORE, Plaintiffs, hereby asks this Honorable Court to grant the following relief against the Defendant COX:

A.     Award compensatory damages,

B.     Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

C.    Award such other and further relief as this Honorable Court deems

just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.


Dated this 18th day of July 2013.


The Law Offices of J. Patrick Buckley III
1404 Dean Street, Suite 300
Fort Myers, Florida 33901
(239) 278-7700 telephone
(239) 278-7701 facsimile
*Attorneys for Plaintiffs*

FOR THE FIRM

J. Patrick Buckley III
FBN: 467707
buckley@jpbesq.com


FOR THE FIRM

Terry Cramer III
FBN: 99360
cramer@jpbesq.com

# Deputy Andy Cox



PLAINTIFF'S EXHIBIT "4"



**SHERIFF**
**JEFFREY J. DAWSY**

## EMPLOYEE NOTICE OF INTERNAL INVESTIGATION

DATE: _____January 15, 2013_____

TRACKING NUMBER: ___13-001-IA___

TO:        Deputy Andy Cox

FROM:   Detective Corey Davidson

The Office of Internal Affairs has initiated an internal investigation reference an allegation/complaint that you have possibly violated a Citrus County Sheriff's Office Directive.

You will be notified when to appear to answer questions fully and truthfully and to present all information and/or evidence relevant to this inquiry when directed by Detective Corey Davidson, the detective in charge of this investigation.

This proceeding will be administrative, therefore, you are ordered to fully cooperate with the investigation. You are entitled to review the complaint and any and all known evidence immediately prior to your interview, if you wish.  It is your responsibility to request this review from me at the time you are called for this administrative interview.  Additionally, if you wish, you may have counsel or a representative of your choosing with you during questioning.

All information concerning this investigation is to remain confidential until the case becomes public record. If you divulge information prior to it becoming public record, you are in violation of CCSO Directive 360.VI.I.1.

Upon completion of the investigation, you will be notified of the results and action, if any, to be taken.

Detective Corey Davidson                              January 15, 2013
                                                                        Date

Andy Cox                                                       January 15, 2013
                                                                        Date

cc:      Commander Buddy Grant
          Commander Robert Blume
          Human Resource Director
          Division Commander

1 DR. MARTIN LUTHER KING JR. AVE. - INVERNESS, FLORIDA 34450-4994  PHONE 352 726-4488

(2) COMPLAINT REVIEW BOARDS.--A complaint review board shall be composed of three members: One member selected by the chief administrator of the agency or unit; one member selected by the aggrieved officer; and a third member to be selected by the other two members. Agencies or units having more than 100 law enforcement officers or correctional officers shall utilize a five-member board, with two members being selected by the administrator, two members being selected by the aggrieved officer, and the fifth member being selected by the other four members. The board members shall be law enforcement officers or correctional officers selected from any state, county, or municipal agency within the county. There shall be a board for law enforcement officers and a board for correctional officers whose members shall be from the same discipline as the aggrieved officer. The provisions of this subsection shall not apply to sheriffs or deputy sheriffs.

(3) CIVIL SUITS BROUGHT BY LAW ENFORCEMENT OFFICERS OR CORRECTIONAL OFFICERS.--Every law enforcement officer or correctional officer shall have the right to bring civil suit against any person, group of persons, or organization or corporation, or the head of such organization or corporation, for damages, either pecuniary or otherwise, suffered during the performance of the officer's official duties, for abridgment of the officer's civil rights arising out of the officer's performance of official duties, or for filing a complaint against the officer which the person knew was false when it was filed. This section does not establish a separate civil action against the officer's employing law enforcement agency for the investigation and processing of a complaint filed under this part.

(4)(a) NOTICE OF DISCIPLINARY ACTION.--A dismissal, demotion, transfer, reassignment, or other personnel action that might result in loss of pay or benefits or that might otherwise be considered a punitive measure may not be taken against any law enforcement officer or correctional officer unless the law enforcement officer or correctional officer is notified of the action and the reason or reasons for the action before the effective date of the action.

(b) Notwithstanding s. 112.533(2), whenever a law enforcement officer or correctional officer is subject to disciplinary action consisting of suspension with loss of pay, demotion, or dismissal, the officer or the officer's representative shall, upon request, be provided with a complete copy of the investigative file, including the final investigative report and all evidence, and with the opportunity to address the findings in the report with the employing law enforcement agency before imposing disciplinary action consisting of suspension with loss of pay, demotion, or dismissal. The contents of the complaint and investigation shall remain confidential until such time as the employing law enforcement agency makes a final determination whether or not to issue a notice of disciplinary action consisting of suspension with loss of pay, demotion, or dismissal. This paragraph does not provide law enforcement officers with a property interest or expectancy of continued employment, employment, or appointment as a law enforcement officer.

(5) RETALIATION FOR EXERCISING RIGHTS.--No law enforcement officer or correctional officer shall be discharged; disciplined; demoted; denied promotion, transfer, or reassignment; or otherwise discriminated against in regard to his or her employment or appointment, or be threatened with any such treatment, by reason of his or her exercise of the rights granted by this part.

(6) LIMITATIONS PERIOD FOR DISCIPLINARY ACTIONS.--

(a) Except as provided in this subsection, disciplinary action, suspension, demotion, or dismissal may not be undertaken by an agency against a law enforcement officer or correctional officer for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within 180 days after the date the agency receives notice of the allegation by a person authorized by the agency to initiate an investigation of the misconduct. If the agency determines that disciplinary action is appropriate, it shall complete its investigation and give notice in writing to the law enforcement officer or correctional officer of its intent to proceed with disciplinary action, along with a proposal of the specific action sought, including length of suspension, if applicable. Notice to the officer must be provided within 180 days after the date the agency received notice of the alleged misconduct, except as follows:

1. The running of the limitations period may be tolled for a period specified in a written waiver of the limitation by the law enforcement officer or correctional officer.

2. The running of the limitations period is tolled during the time that any criminal investigation or prosecution is pending in connection with the act, omission, or other allegation of misconduct.

**112.532 Law enforcement officers' and correctional officers' rights.--**All law enforcement officers and correctional officers employed by or appointed to a law enforcement agency or a correctional agency shall have the following rights and privileges:

(1) RIGHTS OF LAW ENFORCEMENT OFFICERS AND CORRECTIONAL OFFICERS WHILE UNDER INVESTIGATION.--Whenever a law enforcement officer or correctional officer is under investigation and subject to interrogation by members of his or her agency for any reason that could lead to disciplinary action, suspension, demotion, or dismissal, the interrogation must be conducted under the following conditions:

(a) The interrogation shall be conducted at a reasonable hour, preferably at a time when the law enforcement officer or correctional officer is on duty, unless the seriousness of the investigation is of such a degree that immediate action is required.

(b) The interrogation shall take place either at the office of the command of the investigating officer or at the office of the local precinct, police unit, or correctional unit in which the incident allegedly occurred, as designated by the investigating officer or agency.

(c) The law enforcement officer or correctional officer under investigation shall be informed of the rank, name, and command of the officer in charge of the investigation, the interrogating officer, and all persons present during the interrogation. All questions directed to the officer under interrogation shall be asked by or through one interrogator during any one investigative interrogation, unless specifically waived by the officer under investigation.

(d) The law enforcement officer or correctional officer under investigation must be informed of the nature of the investigation before any interrogation begins, and he or she must be informed of the names of all complainants. All identifiable witnesses shall be interviewed, whenever possible, prior to the beginning of the investigative interview of the accused officer. The complaint, all witness statements, including all other existing subject officer statements, and all other existing evidence, including, but not limited to, incident reports, GPS locator information, and audio or video recordings relating to the incident under investigation, must be provided to each officer who is the subject of the complaint before the beginning of any investigative interview of that officer. An officer, after being informed of the right to review witness statements, may voluntarily waive the provisions of this paragraph and provide a voluntary statement at any time.

(e) Interrogating sessions shall be for reasonable periods and shall be timed to allow for such personal necessities and rest periods as are reasonably necessary.

(f) The law enforcement officer or correctional officer under interrogation may not be subjected to offensive language or be threatened with transfer, dismissal, or disciplinary action. A promise or reward may not be made as an inducement to answer any questions.

(g) The formal interrogation of a law enforcement officer or correctional officer, including all recess periods, must be recorded on audio tape, or otherwise preserved in such a manner as to allow a transcript to be prepared, and there shall be no unrecorded questions or statements. Upon the request of the interrogated officer, a copy of any recording of the interrogation session must be made available to the interrogated officer no later than 72 hours, excluding holidays and weekends, following said interrogation.

(h) If the law enforcement officer or correctional officer under interrogation is under arrest, or is likely to be placed under arrest as a result of the interrogation, he or she shall be completely informed of all his or her rights before commencing the interrogation.

(i) At the request of any law enforcement officer or correctional officer under investigation, he or she has the right to be represented by counsel or any other representative of his or her choice, who shall be present at all times during the interrogation whenever the interrogation relates to the officer's continued fitness for law enforcement or correctional service.

(j) Notwithstanding the rights and privileges provided by this part, this part does not limit the right of an agency to discipline or to pursue criminal charges against an officer

_____   _____   _____
Printed Name of Employee   Signature of Employee   Unit I.D. #

_____   _____   _____
Signature of Employee Conducting Hearing   Unit I.D. #

_____
Date

3. If the investigation involves an officer who is incapacitated or otherwise unavailable, the running of the limitations period is tolled during the period of incapacitation or unavailability.

4. In a multijurisdictional investigation, the limitations period may be extended for a period of time reasonably necessary to facilitate the coordination of the agencies involved.

5. The running of the limitations period may be tolled for emergencies or natural disasters during the time period wherein the Governor has declared a state of emergency within the jurisdictional boundaries of the concerned agency.

6. The running of the limitations period is tolled during the time that the officer's compliance hearing proceeding is continuing beginning with the filing of the notice of violation and a request for a hearing and ending with the written determination of the compliance review panel or upon the violation being remedied by the agency.

(b) An investigation against a law enforcement officer or correctional officer may be reopened, notwithstanding the limitations period for commencing disciplinary action, demotion, or dismissal, if:

1. Significant new evidence has been discovered that is likely to affect the outcome of the investigation.

2. The evidence could not have reasonably been discovered in the normal course of investigation or the evidence resulted from the predisciplinary response of the officer.

Any disciplinary action resulting from an investigation that is reopened pursuant to this paragraph must be completed within 90 days after the date the investigation is reopened.

History.--s. 2, ch. 74-274; s. 2, ch. 82-156; s. 2, ch. 93-19; s. 721, ch. 95-147; s. 1, ch. 98-249; s. 1, ch. 2000-184; s. 1, ch. 2003-149; s. 3, ch. 2005-100; s. 1, ch. 2007-110; s. 1, ch. 2009-200.

_____     _____     _____
Printed Name of Employee          Signature of Employee              Unit I.D. #

_____     _____
Signature of Employee Conducting Hearing              Unit I.D. #

_____
Date

Revised July 1, 2009



# CITRUS COUNTY SHERIFF'S OFFICE

## *GARRITY WARNING*

The purpose of this interview is to solicit responses that will assist in determining whether disciplinary action is warranted, and the answers furnished may be used in disciplinary proceedings that could result in administrative action against you, including dismissal.

All questions relating to the performance of official duties must be answered fully and truthfully, and disciplinary action, including dismissal, may be undertaken if you refuse to answer fully and truthfully.

No answer given, nor any information gained by reason of such statements, may, as a matter of constitutional law, be admissible against you in any criminal proceeding filed as a result of the actions we are investigating today.   **However, should you engage in lying, untruthfulness, misstatement, or should you fail to respond to, or omit responding to, any question asked you, fully and truthfully, you can be prosecuted for perjury, giving false statements, or obstruction of justice.**

I have read and understand the above.

SIGNATURE: _A. Co. 1543_____   DATE/TIME: _01-15-2013_____

WITNESS: _____ DATE/TIME: _1-15-13   8:50Am_____

**1 DR. MARTIN LUTHER KING JR. AVE. - INVERNESS, FLORIDA 34450-4994   PHONE 352 726-4488**



CITRUS COUNTY SHERIFF'S OFFICE

*A Nationally Accredited Law Enforcement Agency*

Communication or Imparting Confidential Information – CCSO personnel will not communicate or impart confidential law enforcement information, either in writing or verbally, to unauthorized persons. This includes information obtained during the course of employment and to other agencies, over any communication network and to the public. Personnel will not disclose any information regarding administrative investigations or disciplinary actions until such action becomes public record.

I have read and understand the above.

SIGNATURE: _A. Lox 0543_  DATE/TIME: _01-15-2013_

WITNESS: _Del. ____ J44_  DATE/TIME: _1-15-13   8:50AM_



**SHERIFF**
**JEFFREY J. DAWSY**

## INTERNAL INVESTIGATION NO. 13-001

## PRODUCED FROM AN ELECTRONIC RECORDING

| Sworn Statement of: | Taken By: |
|---|---|
| Deputy Andy Cox | Detective Corey Davidson |
| **Date of Interview:** | **Transcribed by:** |
| January 28, 2013 | Traci Beagan |

**DET. COREY DAVIDSON:** Today's date is January 28th, 2013, this is Detective Corey Davidson, I have Deputy Andy Cox present. This is in reference to Internal Affairs Case Number 13-001. The case number that applies to this incident is 09-07-0857. Andy you are familiar with the Bill of Rights? You have been given that paperwork and did sign and understand it?

**DEP. ANDY COX:** Yes sir I am.

**DET. COREY DAVIDSON:** Confidentiality Acknowledgement as well?

**DEP. ANDY COX:** Yes sir.

**DET. COREY DAVIDSON:** You do understand the complaint?

**DEP. ANDY COX:** Yes sir.

**DET. COREY DAVIDSON:** You did read all the applicable paperwork?

**DEP. ANDY COX:** Yes

**DET. COREY DAVIDSON:** Did you review the case?

**DEP. ANDY COX:** Yes sir

**DET. COREY DAVIDSON:** You are familiar with the policies that are involved?

**DEP. ANDY COX:** Yes sir

**DET. COREY DAVIDSON:** This is a sworn digitally recorded interview taken by a law enforcement officer pursuant to Section 117.10 of the Florida State Statute. Please raise your right hand. For the record, show his right hand is raised. Do you swear or

affirm that the statement you are about to give will be the truth, the whole truth and nothing but the truth?

**DEP. ANDY COX:**  I do

**DET. COREY DAVIDSON:**  Andy what I'd like you to do, this occurred on uh July 21st, 2009. This is directly in reference to a YouTube video which was taken from your dash cam, and correct me if I'm wrong, um that occurred during a traffic stop which this case number is related to. Is that correct so far?

**DEP. ANDY COX:**  That's correct.

**DET. COREY DAVIDSON:**  What I'd like you to do is I would like you to start at the beginning of how you became familiar with this vehicle, this family, this incident um why you made the traffic stop and what occurred.  So, I just want you to start from the very beginning and tell me a story about what happened.

**DEP. ANDY COX:**  Ok, at that time, I was assigned as a community resource officer working the west side of Citrus County, particularly Zone 3 and 4 west.  We had multiple meth labs in the Chasahowitzka area at that time and we were actually working multiple meth labs attempting to get search warrants for those meth labs.  Um, Deputy Kathy Settles had contacted me prior to this incident in reference to a citizen who had contacted her to an individual named "JT" who was actively selling meth and pills in the Chas area and around the Chas area. Um, I was in Chas, I developed a couple of concerned citizens, basically people living in the area where all this was occurring. Most of it was on the west side of US 19.  Um their residence happened to be on the east side of 19 but still in Chasahowitzka

**DET. COREY DAVIDSON:**  Those residents, would you consider them confidential informants?

**DEP. ANDY COX:**  No, they weren't confidential informants they were just citizens who were tired of the drug trade happening around their houses.

**DET. COREY DAVIDSON:**   Did they come to you or did you develop them?

**DEP. ANDY COX:**  One of them came to me and then when I was working the neighborhood stopping and talking to people you could say I developed them, but I was basically asking people you know "what's going on in your neighborhood?"

**DET. COREY DAVIDSON:**  Go ahead and continue

**DEP. ANDY COX:**  You know, who's selling drugs, you know, what's happening, what's the traffic. So working all that I finally developed "JT's" last name and it was Jonathan Thomas Cooper. Once I developed that, found out where he lived which is happens to be now the same residence that Mr. Smith, Joel Smith I arrested lives at.

**DET. COREY DAVIDSON:**   Did Joel Smith live at that residence while JT was there? Do you know?

**DEP. ANDY COX:**  I don't know if he lived there but I know he was there a lot.  I never, well I never really made contact with him but I would see the vehicle. So I can't say he was living there but I know the van I stopped on the traffic stop was there several times, generally backed into the driveway. Um, I actually conducted a knock and talk at JT's residence.  Never made contact with Mr. Smith but I made contact with, who is now, Mrs. Smith and JT

**DET. COREY DAVIDSON:**   Her first name is Brenda?

**DEP. ANDY COX:**  Brenda

**DET. COREY DAVIDSON:** And she is present in that video, is that correct?

**DEP. ANDY COX:** Yes she is

**DET. COREY DAVIDSON:**   Ok

**DEP. ANDY COX:**   And I'm not sure the exact date and time that I made contact with JT for the knock and talk. Made contact with I believe it's April Dawn Cooper who is JT's sister and I cannot remember JT's girlfriend's name.  She was there also.

**DET. COREY DAVIDSON:**   How old is JT? Approximately

**DEP. ANDY COX:** In his late 20s

**DET. COREY DAVIDSON:** Ok and Andy I want to make sure that when your discussing this, I'm asking about residences and and times and dates of birth, we're talking about 2009.

**DEP. ANDY COX:**  Correct

**DET. COREY DAVIDSON:**  Ok dates of birth and residences. And if we need to refer to present day, we'll do that. We'll make it clear at that time

**DEP. ANDY COX:**  Ok so there was obvious signs of methamphetamine use both by JT Cooper and JT Cooper's girlfriend.  There was obvious signs that his sister was under the influence of narcotic analgesics.  Um I am a drug recognition expert, I have been trained to look for the signs and symptoms but the nut sores were very very obvious on the two, um it was rumored that JT was using the vacant house adjacent to him to manufacture methamphetamine, um later on that house was searched, there was nothing concrete to make a case on but it was obvious that something had been going on in that house.

**DET. COREY DAVIDSON:**  Was it an abandoned house?

**DEP. ANDY COX:** It was an abandoned house at the time. And pretty beat up. Today the house looks very very different than what it looked like back in 2009. I mean it's really fixed up now. And what happened is is JT went off and went to Michigan and stayed out there for a couple years. And then when he came back down here he was subsequently arrested for I think a couple different drug violations. Um I can't remember the exact charges but ended up talking to him later and debriefing him at the jail I think in um late 2012 and he kind of filled in the gaps for the people that I didn't know about all the way back from 2009. Um, subsequently after this we ended up arresting April Dawn Cooper with a large amount of narcotic analgesic pills outside the Walgreens in Homosassa. So while I was working a fairly large group of people about 8 to 10, in the meth world, um I kept seeing the van but never had a tag on it, never really saw people driving it around. And that's kind of how all this came about.

**DET. COREY DAVIDSON:** And you saw it in the residence driveway?

**DEP. ANDY COX:** Yes and I saw it other places in Chas where people are known to hang out, do drugs, sell drugs and things of that nature.

**DET. COREY DAVIDSON:** Did you receive-------------? (inaudible)

**DEP. ANDY COX:** No, I never did. Um, there's several vans very much like this van, um in that area and to this day there still is. But I never had the particular tag on this vehicle. I was just never able to get it. Um, it was explained to me by

**DET. COREY DAVIDSON:** I'm going to interrupt. When you say it never had a tag, you mean that

**DEP. ANDY COX:** I never was able to see it. Cause I never saw it in operation and there was not legal grounds for me to go on certain pieces of property that had fences um

**DET. COREY DAVIDSON:** Ok go ahead

**DEP. ANDY COX:** So while working all this and developing all the information I was told numerous times about several people carrying hand guns because they were afraid of another drug dealer ripping them off.

**DET. COREY DAVIDSON:** Now are you referring to this family and JT?

**DEP. ANDY COX:** JT, JT, Jason Nowacky, Dana Jowers, um Leo Radford, uh they were particularly afraid of a couple of the guys who were manufacturing methamphetamine up in Inglis.

**DET. COREY DAVIDSON:** Were you talking to the individuals that are involved in that circle that gave you the information about fire arms?

**DEP. ANDY COX:**  It was basically rumored by a lot of the citizens that I talked to. I also debriefed several people I had arrested who had actually bought drugs from JT Cooper who had told me about it. Um and basically they were scared of Eric Adams and they were scared of William Roddenberry.  And those are two guys from the north end but they were dealing down in the south end because at that time the meth world wasn't that huge. There was far less cooks than there are today. So having that in mind I was in high alert.  Um methamphetamine causes a lot of things including hallucinations, you run very much quicker than you normally run in your normal bodily functions. Your decision making ability is not that great um so whenever I dealt with these people I was always on high alert, uh knowing what I know, being trained to recognize the things that I recognize in people that are under the influence of narcotics I'm very nervous when I've been told by numerous people in upwards of 25 people that they were arming themselves due to the fact they were afraid of their rival drug dealers.

**DET. COREY DAVIDSON:**  I know you already mentioned it but in 2009 what was your training in drug recognition?

**DEP. ANDY COX:**  I actually got my certification in 1999 for drug recognition expert and I stayed current up until this date. I'm still current as a drug recognition expert. So every two years I have to go to an eight hour school and be re-updated. I have to have a uh instructor look at everything that I do throughout those two years and go over my drug recognition expert evaluations and then I have to pass a test with the instructor  to show that I'm still proficient in being a drug recognition expert.

**DET. COREY DAVIDSON:**  Ok, go ahead and continue.

**DEP. ANDY COX:**  I was actually down in Chassahowitzka, it's been a long time but I'm pretty sure I was about to head down to Leo Radford's house off of Riviera, I cannot remember the exact address but it was just down a little bit prior to the fire station on the right hand side.  It was actually on Riviera, there was a couple guys there cooking methamphetamines. We were never able to develop a search warrant for that particular residence. As I see the van on Ms. Maggie, I go ahead and turn around on it. As I turn around on the van I come up behind it I see an expired decal. I ran the tag, both at that time our "premier" program and in "David".

**DET. COREY DAVIDSON:**  What was your reason for turning around in the van?

**DEP. ANDY COX:** Because I recognized it as the vehicle that was involved in the drug activity in Chassahowitzka

**DET. COREY DAVIDSON:**  Who did you believe at that time to be driving the van or possibly driving the van? Or did you know?

**DEP. ANDY COX:**  I had no idea. I noted it at JT Cooper's house, I know there was numerous people at JT's house that were involved in the drug trade but I never saw the

driver. Um, to be able to identify him.  By the time we went by each other I was like, "that's the van". I turned and I

**DET. COREY DAVIDSON:**   Did you pass opposite directions?

**DEP. ANDY COX:**   We passed opposite directions. Um, so when I turned around I came up on it, I ran it in both systems the computer was froze. I reached down on the radio and I called in I can't remember if I called in on teletype or I just stayed on west

**DET. COREY DAVIDSON:**   Ok teletype is used for

**DEP. ANDY COX:**   running tags

**DET. COREY DAVIDSON:**   Typically tags, drivers licenses, criminal histories

**DEP. ANDY COX:**   I think I switched over to teletype because I wasn't sure if I was going to stop the vehicle yet or not so as I'm running the tag over the radio the computer's still locked up, we're about to make a left hand turn onto US 19. I see both occupants of the vehicle looking back at me. They know I'm back there. I'm in a marked vehicle, I'm not in an undercover vehicle.

**DET. COREY DAVIDSON:**   Could you see through the van or were you looking in the side view mirrors?

**DEP. ANDY COX:**   Looking through the side view mirrors just because of the length of it. And I can obviously see they're looking at me. They know I'm there, there's no question about it.

**DET. COREY DAVIDSON:**   Do you recognize the driver at that time or could you tell?

**DEP. ANDY COX:**   I did not recognize him, I had no idea who the driver was, I had never seen him before this date. I didn't realize who the female was until about the time that the weapon came out. Because I had only dealt with her once before and that was on the knock and talk. She wasn't somebody that you know I would remember. But I remember the vehicle. So I was going to let the vehicle go a little way, I still wasn't sure if I was going to stop it, I was going to wait to come back and see if the tag was valid because basically I was going to try to work and be able to search the vehicle is what I was thinking at the time. And uh if it was just displayed sticker, decal, but he had a good tag I probably wasn't going to stop on that cause I didn't think it would be great PC, TC to work it into a drug stop.

**DET. COREY DAVIDSON:**   Now you are a canine deputy now, were you at that time?

**DEP. ANDY COX:**   No I was not. I was a Community Resource Officer, um so after we proceed north all of a sudden the van puts on its right turn signal and go ahead and turn into a parking lot. At that time I didn't want to get all the way into the parking lot I wanted to go ahead and stop him somewhere other than where we're in a really tight confined

space. So I went ahead and initiated, turned on my blue lights I think I tapped my siren twice.

**DET. COREY DAVIDSON:**    And this is after 2pm sometime?

**DEP. ANDY COX:**    Yeah, it was daylight. It was daylight. Nothing came back on the radio, I did call out the traffic stop for why I was stopping. Um, I generally get out of my vehicle very quickly. I don't I don't sit there.

**DET. COREY DAVIDSON:**    Explain to me how your dash cam comes on?

**DEP. ANDY COX:**    As soon as you activate the blue lights it automatically comes on and it backs up three minutes from there. So it would have showed very possibly the turn around, when I turned around on him, and it definitely would show when I was at the red light with him uh it would have recorded all the traffic of me calling in the tag and everything of that nature or if you just want to record somebody like say your following somebody and they're swerving all over the road and you just want to start the recording without activating your blue lights you can reach up and hit the record button and it will also start recording.

**DET. COREY DAVIDSON:**    This particular incident it came on automatically?

**DEP. ANDY COX:**    Automatically, yes.

**DET. COREY DAVIDSON:**    And that section of the video is not visible on Youtube, it's been cut from that footage?

**DEP. ANDY COX:**    Yes

**DET. COREY DAVIDSON:**    That video is also not available at this office. This is a 2009 case we've already talked about. It did go to the State Attorney's Office and the case was dropped. There was a disposal done on the video, the State Attorney has purged their case. They purged their files. They did not retain the video. It did go to discovery so it was released to the defendant's attorney. This office did not retain that video either. It was kept for 2 years and then it was disposed and that was not at your request but you did sign the evidence disposal form?

**DEP. ANDY COX:**    Yes

**DET. COREY DAVIDSON:**    Ok, so we do not have access to that current video. Did you keep an archived copy of that?

**DEP. ANDY COX:**    I prob....no because once it was destroyed in evidence I don't keep a copy after that.

**DET. COREY DAVIDSON:**    Go ahead and continue.

**DEP. ANDY COX:** Um, so I get out very quickly, if my vehicle's coming to a stop my seatbelt is already off, I already have my hand on the door handle, the vehicle goes into park and I exit the vehicle. I pretty much do that on every traffic stop.  On a high alert traffic stop I'm even quicker. Um, so as I'm coming around my door he's jumping out of his vehicle

**DET. COREY DAVIDSON:** On your typical traffic stop what would be your request to the driver?

**DEP. ANDY COX:** I would ask him to get back in the vehicle and close the door.

**DET. COREY DAVIDSON:** Do you recall doing that at that time?

**DEP. ANDY COX:** I did not and the reason I did not is I was trying to be super nice to work it into a consensual search of the vehicle for narcotics

**DET. COREY DAVIDSON:** Did he or I'm sorry, were you out of your vehicle when he exited his?

**DEP. ANDY COX:** Yes, I was already just about to cut around to walk up to his vehicle when he was stepping on the ground and I went ahead and backed up and kind of got behind my driver's side front door panel.

**DET. COREY DAVIDSON:** Go ahead and continue.

**DEP. ANDY COX:** So I asked him for his um drivers license, his body language his hand movement, everything to me suggested something was wrong. Something was not normal.  I went ahead and drew my gun ¾ the way out of the holster. I didn't come all the way out of the holster but I just felt something was wrong.

**DET. COREY DAVIDSON:** This is before you saw the

**DEP. ANDY COX:** The holster. Before I saw the holster. Um

**DET. COREY DAVIDSON:** Because you were out of frame at that point?   24:06 17:20

**DEP. ANDY COX:** Right, I didn't like the way that his body language was, I didn't like the open funnel of the van onto the passenger, I didn't like anything about it, something felt wrong but I continued on with the stop

**DET. COREY DAVIDSON:** Did you have information prior to that stop that the driver of that vehicle or the potential driver of that vehicle could be or would be possibly armed?

**DEP. ANDY COX:** Yes because of all the people at that time that were carrying hand guns due to the fear of the other drug dealers.

**DET. COREY DAVIDSON:** And that vehicle was familiar to you?

**DEP. ANDY COX:**  Yes it was

**DET. COREY DAVIDSON:**  Go ahead and continue

**DEP. ANDY COX:**  So I was still trying to work the drug case, I still didn't feel comfortable but I had my left hand on my gun 3/4 of the way out of the holster.

**DET. COREY DAVIDSON:**  And you're left handed?

**DEP. ANDY COX:**  I am left handed, um he reaches back, when he reaches back I go ahead and blade my body and I'm getting ready to duck and he fumbles for a while and when he comes out, he comes out with a large black wallet and brings his hands forward and stops, almost like he was practicing drawing a gun. But he fumbles. So he gets out his driver's license and before I I see him messing with his shirt again. So now I'm even on higher alert. So he hands me just his driver's license

**DET. COREY DAVIDSON:**  Did he at anytime up until that point indicate to you that he was carrying a firearm?

**DEP. ANDY COX:**  No he did not

**DET. COREY DAVIDSON:**  He's not required to do that but did he do that?

**DEP. ANDY COX:**  No he did not.

**DET. COREY DAVIDSON:**  Ok, go ahead

**DEP. ANDY COX:**  So when he hands me the drivers license I go ahead and step back and created distance while he's going to retrieve his registration cause he say's "no" you know "I paid for my tag" and I'm like "ok".

**DET. COREY DAVIDSON:**  How far are you away? We have to understand, Andy the video is two dimensional

**DEP. ANDY COX:**  Right

**DET. COREY DAVIDSON:**  It does not represent a three dimensional view so you were viewing that video from one perspective, a camera's perspective and a two dimensional view so it's hard to calculate distance.  How far were you from the individual? Who we know now as Joel Smith.

**DEP. ANDY COX:**  I would say seven to ten feet. Because the length of the car at that time was you know pretty close to seven feet.

**DET. COREY DAVIDSON:**  How far was your car from his van?

**DEP. ANDY COX:** Well when they stopped because I couldn't see them I came around and stopped on an angle where I was kind of being able to see the van instead of being directly behind it. Because I couldn't see anything from directly behind it. That's why my

car is out and around and being that we weren't on the road I didn't have to worry about all the traffic rolling by or anything like that. I took up the best position I thought I could take up on that traffic stop.

**DET. COREY DAVIDSON:** Ok, go ahead.

**DEP. ANDY COX:** So when he reaches in to get the registration I see a very large hand gun strapped to his right hand side. I go ahead and draw my gun, I bring it up, they changed the name of it but I bring it up towards my chest to where the barrel's pointing at the ground by his feet.

**DET. COREY DAVIDSON:** Tucked in close to your body?

**DEP. ANDY COX:** It's tucked in close to my body, I'm not out at arm's length I'm up close. And I asked him, "why do you have a weapon?" I don't know if I said weapon or hand gun I would have to watch the video. And his response was "I always carry a weapon". His response wasn't anything else. "I always carry a weapon" is what he told me. So at that point I come out and I tell him to put his hands up and step away from the door.

**DET. COREY DAVIDSON:** Now right now your displaying as if you're pointing your gun at him.

**DEP. ANDY COX:** I'm pointing my gun directly at the center of his back, the best shot I think I can take at this time.

**DET. COREY DAVIDSON:** At this point had he turned around?

**DEP. ANDY COX:** Not yet. So I give him a command

**DET. COREY DAVIDSON:** Let's back up. Is he facing into the vehicle?

**DEP. ANDY COX:** He's facing in the vehicle. Um and at that point the only place I had to shoot him safely for me was in the back. Um, I got somebody that I don't know what their status is, I don't know if they are armed also but for my target was his back.

**DET. COREY DAVIDSON:** Let me ask you this. With your training, and your experience is it possible for someone to be a threat to you while they're facing away?

**DEP. ANDY COX:** Oh absolutely action always beats reaction we've been trained that since I became law enforcement

**DET. COREY DAVIDSON:** Could he have fired that gun while he was facing into his vehicle?

**DEP. ANDY COX:** Absolutely or if she had a gun because where there is one gun there's two. That's what we're trained. He could have moved a little bit and she could have fired right at me, even easier than he could have.

**DET. COREY DAVIDSON:**   Go ahead and continue

**DEP. ANDY COX:**  I'm in a bad spot, I know I'm in a bad spot I blade enough to where there's not a straight shot coming out the door of me and I was going to try to decide what's the best way to disarm this person. So as I tell him to put his hands up and step to the right he hesitates. There's a hesitation I can see it in his body language, I can see it in his movement. He hesitates. When he hesitates, in a clear, loud, concise voice I let him know exactly what I was going to do.

**DET. COREY DAVIDSON:**   And you can speak freely.

**DEP. ANDY COX:**   Yeah, I told him "If you don't put your hands up I'm going to shoot you in the fucking back" He's armed with a weapon, I don't know who he is, I don't know if she's armed with a weapon, I'm in a fatal funnel and I'm in fear of my life. He still hesitated but he moved. At this point I knew that I had the action on him. I was already on target, I was already ready to pull my firearm.

**DET. COREY DAVIDSON:**   When did he tell you that he had a permit?

**DEP. ANDY COX:**   I'd have to watch again but I'm pretty sure

**DET. COREY DAVIDSON:**   I want you to tell me from your recollection

**DEP. ANDY COX:**   When I was hand cuffing him. I think he said it and she said it. Or when I had him on the ground just prior to hand cuffing. It was when I was doing that transition to hand cuffing him. Somewhere right in there is when he told me he had a concealed weapons permit. But I know when I got on high ready when I was pointing my gun at his back then he told me was "I always carry a weapon"

**DET. COREY DAVIDSON:**   Did you ever ask him if he had a permit?

**DEP. ANDY COX:**   No I did not.

**DET. COREY DAVIDSON:**   Continue

**DEP. ANDY COX:**   So when I get him moved off to the right, even though a door isn't "cover" it is concealment and she's still sitting right there, so I reach for her I kick the door closed, I step back again, getting a better position and I order him to the ground. I didn't feel it was safe to try and go and disarm him in the position he was, from a standing position. I am also a defensive tactics instructor, I know how easy it is to swing your arms down and grab somebody by their arm when they are coming up trying to do something. I didn't feel it was safe to take his weapon from him in a standing position. I knew it wasn't safe cause she's still a threat, I don't know what she has, he's still a threat because he's armed so I decided to put him on the ground. When I went to put him on the ground he faced me and hesitated again. Instead of going down on the ground he turned and faced right at me with his hands up. His hands weren't up here, his hands were down here. They were still in the action beats reaction, so I finally

ordered him to the ground. Once he was on the ground I quickly moved and as quickly as possible, because I have to holster the handcuff, I got in the best position I could get in to be able to handcuff him as safely as possible plus still worry about her.

**DET. COREY DAVIDSON:** Was she still in the car at this time?

**DEP. ANDY COX:** She's still in the car at this time.

**DET. COREY DAVIDSON:** the van

**DEP. ANDY COX:** The van. Um and I did reach in and take the keys out of the van just so I wouldn't get run over cause I knew no matter what I wasn't in a good position. It was not the greatest position for me to be in but at the time it's what I had to work with. Um so I did take the keys and then slam the door. Um, when I did take the keys I did put my gun down, it wasn't pointing at her. But it was on my chest where it was ready. Cause she basically had her hands where I can see them at that time. Doesn't mean there's not a gun right there with her and she's waiting for ambush but she had her hands where I can see her so I didn't point my gun at her. So, as I handcuff him I get him in hand cuffs. Where his gun was, once he was in handcuffs to me he was a far less threat than somebody with their hands un-cuffed. I wasn't, once he was handcuffed, I could feel the stiffness in his arms, I can feel the stiffness in his hands, I knew where his gun was. I was worried about him reaching for his gun, but I was way more worried about her having a second weapon. So what I did is I went up, went around, asked her to exit the van. She exited the van, I still had my gun out but it's down. I have her walk forward, have her lift up her shirt, have her turn around, from what she was wearing without patting her down, it was pretty obvious she did not have a weapon. I still didn't like the position I was in. I had her walk over where I could see her then I walked back around to him, watched her, re-holstered my weapon, got him off the ground, secured his weapon and then placed him in the car. Now, I escalated very high once I saw the weapon, I let him know clear, loud, concise commands what I was going to do if he reached for it.

**DET. COREY DAVIDSON:**   Why?

**DEP. ANDY COX:** I was in fear of my life. He had a weapon, I don't know him, he had never said anything about a concealed weapons permit. Action beats reaction, I'm trained that when I'm faced with deadly force that I am instantly to go to my handgun. Nothing else I carry. Instantly go to my handgun because that's the only thing that's going to be able to save my life. So I escalated, I was very polite in the beginning, I escalated very high, once I took him in control I de-escalated immediately. Never cursed again, I was never rude again, I talked to him, you know, talked to her. It was done. I wasn't mad, I wasn't upset, but it was a violation of state statute dealing with these people

**DET. COREY DAVIDSON:** You're talking about his action?

**DEP. ANDY COX:**  His action being able to see the firearm and not being concealed.

**DET. COREY DAVIDSON:**   Let's discuss this for a moment.

**DEP. ANDY COX:** Ok

**DET. COREY DAVIDSON:**  2009 State Statutes.

**DEP. ANDY COX:**  Yup

**DET. COREY DAVIDSON:**  And I'll state this and you correct me if I'm wrong.  In 2009 there was no provision in the statute that allowed for incidental or accidental exposure is that correct?

**DEP. ANDY COX:**  That's correct.

**DET. COREY DAVIDSON:**  Now, an amendment came forth in 2011

**DEP. ANDY COX:**   Right

**DET. COREY DAVIDSON:**   That does allow for accidental/incidental exposure.

**DEP. ANDY COX:**  Yeah

**DET. COREY DAVIDSON:**  So now it's allowed.

**DEP. ANDY COX:**   Right

**DET. COREY DAVIDSON:**   In 2009 during this traffic stop it was not allowed by state statute.

**DEP. ANDY COX:**  That is correct. And I actually reviewed the state statute which 99 9/10ths percent of the time, once I have somebody secured and I'm going to make an arrest, I pull out my statute book, it sits in my front seat. I read the statute to make sure it's going to be a lawful arrest.

**DET. COREY DAVIDSON:**  You mean you read the statute at the time of the traffic stop?

**DEP. ANDY COX:**   As soon as I got my backup there and everything was secure, the van was checked, I had back-up there, it was Kathy Settles, Deputy Settles.  I pulled out my law book, I opened it up and I re-read the statute. It's a very short statute.

**DET. COREY DAVIDSON:**   Ok go ahead.

**DEP. ANDY COX:**  So I knew I had probable cause and I had the state statute to back me up on the arrest.  Um, I lost track of where we were going.

**DET. COREY DAVIDSON:**   Let's back up a minute. When he leaned into that car Andy did the gun become exposed because you asked him to retrieve his his driving license, or his registration and proof of insurance?

**DEP. ANDY COX:**  As soon as he turned I saw something on his back. As soon as he moved I saw the bottom part of the hand gun. When he reached in, I, other than maybe a very small piece of the top of the grip, I saw the whole hand gun. I can see the holster, I could see everything.

**DET. COREY DAVIDSON:**   Ok go ahead and continue

**DEP. ANDY COX:**  Where did we leave off at? From

**DET. COREY DAVIDSON:**   From the time he's on the ground, he now became compliant, you saw her hands, you de-escalated, and what happened then?

**DEP. ANDY COX:** Um, he started telling me about his background and his experience, that he had gone to the academy

**DET. COREY DAVIDSON:**  And that's all cut out of the video?

**DEP. ANDY COX:**  That's all cut out of the video. He named several people he knew in the Sheriff's Department and I told him, I said "sir, I don't care, you displayed a firearm, you got out, you faced me, you reached back several times right where your firearm was, you were in an offensive stance, you're going to jail for this". I felt he was a threat. I felt he was trying to _____ if he was going to be able to get away with having that very large firearm on his side the next time he may encounter law enforcement. And that's my true belief. Knowing the background of the family, knowing the background of everything that was going on with the drug activity, that's what I felt he was trying to do at the time.

**DET. COREY DAVIDSON:** Let's give an example. You just mentioned knowing the background of the family and the vehicle and the history of that area and it's actually the case you were working?

**DEP. ANDY COX:**   Right

**DET. COREY DAVIDSON:**  If this were a normal traffic stop, and you pulled over a random car that was driving up 19 for the same thing, a tag violation, and that similar incident would have occurred, how would you have handled it?

**DEP. ANDY COX:**  One, I would have asked him to step back in the vehicle and have a seat. That would have been the first thing I would have done. Um, 99% of the time when I encounter someone with a concealed weapons permit, and I walk up to the vehicle, they tell me, "I have a concealed weapons permit". "Ok, where's your weapon at?" "It's here", "do me a favor, just don't reach for it, keep your hands up on the steering wheel. Thanks, I appreciate it"

**DET. COREY DAVIDSON:**  Do you secure that weapon?

**DEP. ANDY COX:**  It, it depends on the stop. I would say depending on where it is, a lot of times I don't. Um, there are times where he's like "listen, the weapon's right here", "Ok, step out of the vehicle". Walk away, have them lift up their shirt, check them and then I'll secure the weapon, but I do not secure that weapon every time because there is a lot of times it's actually safer just to leave that weapon in the container it's in rather than with other people, start reaching in and grabbing the weapon.

**DET. COREY DAVIDSON:**  Do you ask to see their permit?

**DEP. ANDY COX:**  I ask to look at their permit. And if they have a valid permit, like I said, there's a lot of times I don't secure that weapon.  Usually when your dealing with somebody with a concealed weapons permit they have gone through a background check, they're generally a very good citizen and if I don't feel un-safe and I don't feel it's necessary to secure the weapon, I let them keep their weapon until after the traffic stop.

**DET. COREY DAVIDSON:**  Did you ever view Mr. Smith's permit?

**DEP. ANDY COX:**  Yes I did.

**DET. COREY DAVIDSON:**  Was it valid?

**DEP. ANDY COX:**  It was valid other than the fact that he never updated his address. As far as him going through all the steps to get it, yes. He just never updated his address in quite a few years and he had moved since then.

**DET. COREY DAVIDSON:**  Is there anything else that you think is relevant in reference to that traffic stop?

**DEP. ANDY COX:**  Um, as far as the traffic stop, the biggest thing is just the way he was moving and acting. That was my biggest indicator. That's why I was on such high alert.  The fact that I knew where the vehicle came from, I knew the other people associated with the vehicle. I just didn't know Mr. Smith.

**DET. COREY DAVIDSON:**  How long had you been working the lead in reference to that vehicle and the drugs in that area?

**DEP. ANDY COX:**  Actively with them? I want to say about six months. Somewhere in that time frame. Unfortunately it was the old email system, and those emails had been deleted. Um

**DET. COREY DAVIDSON:**  We did change over to a new system.

**DEP. ANDY COX:**  We changed over to a new system so I don't have the exact dates but it had been a while since I had been working it.  And uh, we made several arrests, you know during that time frame.

**DET. COREY DAVIDSON:**   After this traffic stop occurred, and the arrest, were you contacted by a supervisor?

**DEP. ANDY COX:** I actually contacted my supervisor in reference to the use of force of pointing my firearm at somebody.

**DET. COREY DAVIDSON:** Tell me how that happened?

**DEP. ANDY COX:** As soon as everything was under control I contacted my supervisor, notified him of the traffic stop, notified him that I had a use of force and I also had a video of the traffic stop.

**DET. COREY DAVIDSON:** Was this after you had transported Mr. Smith to the jail?

**DEP. ANDY COX:** I'm not 100% because it's been three years but more than likely yes. But once he was secured at the jail, generally that's when I make the phone call, unless you know, there's another reason to.

**DET. COREY DAVIDSON:** Did you meet with a supervisor after that phone call?

**DEP. ANDY COX:** Yes I did

**DET. COREY DAVIDSON:** What was that meeting about?

**DEP. ANDY COX:** Um, it was about the stop itself. You watch the video, um my other supervisor who is retired now, Captain Simmons also reviewed the use of force report. They reviewed my report, reviewed the video

**DET. COREY DAVIDSON:** Did Captain Simmons review the video at that time do you know?

**DEP. ANDY COX:** I'm pretty sure he did. It's been three years, but I'm pretty sure he did.

**DET. COREY DAVIDSON:** Who was the supervisor that you talked to directly? Who signed the use of force?

**DEP. ANDY COX:** Both Sergeant Fields and Captain Simmons.

**DET. COREY DAVIDSON:** Ok so Sergeant Dave Fields was your Sergeant at the time?

**DEP. ANDY COX:** Yes

**DET. COREY DAVIDSON:** He's the one that you talked to directly after this incident?

**DEP. ANDY COX:** Yes, yup, yup

**DET. COREY DAVIDSON:** Tell me what that conversation was about?

**DEP. ANDY COX:**  He really didn't like the arrest because it was a simple display of a weapon but it fit the statute. He counseled me about the arrest, he counseled me about my language used on the traffic stop and I explained to him why I did it. Just like I have explained to you. Um, so that was basically it.

**DET. COREY DAVIDSON:**   Did he document that counseling?

**DEP. ANDY COX:** I don't think so.

**DET. COREY DAVIDSON:**  Did you perceive your conversation with Sergeant Fields as a counseling?

**DEP. ANDY COX:**   Yes. Um, and I just tried to curtail my vulgar language, use of curse words since that point.

**DET. COREY DAVIDSON:** Andy is there anything else you would like to add? Anything I may have neglected to ask you? Anything you think is important?

**DEP. ANDY COX:**  I'm going to go over my notes real quick.  That the one thing, I did use the least amount of force necessary to affect that arrest.  Granted, I pointed my gun at him, but, other than that there was no force. I was polite in the beginning, I escalated very high, gave him loud, clear, concise commands, as soon as the situation was secure I instantly de-escalated and I was polite to him and his wife again. Um, it was a bad situation. I could have made it better. My mistake was I didn't ask him to get back in the vehicle right away. I was trying to work that drug case which I shouldn't have done. I should have been more officer safety and asked him to get back in the vehicle right away. That's what I almost always do. I didn't do it this time. I think I triaged the situation as bestly as I could.  I know there is some issues with handcuffing, I know there is some issues with leaving him laying face down, possible asphyxiation, but that point it was going to be so quick my safety was more important and the fact that I hadn't cleared her out of the vehicle. Once she was cleared out of the vehicle, I went ahead and got him up, did what I had to do. So, even reviewing it now, triage and I think I did the best job I could with what I had at the time. Could it have been avoided if I asked him to get back in the vehicle? Yes. But once everything went down, I think I did what I needed to do to keep myself safe.

**DET. COREY DAVIDSON:**   Did you ever gain information or a reason or permission to search that vehicle?

**DEP. ANDY COX:**   We didn't search it for the narcotics but we did clear the vehicle for weapons.

**DET. COREY DAVIDSON:** And this is after the end of the video and Deputy Settles showed up as backup, is that correct?

**DEP. ANDY COX:**   Right, but I think the video continued to run but it's cut off at that point.

**DET. COREY DAVIDSON:**   There are a couple cuts in the video.

**DEP. ANDY COX:**   Right, I'm pretty sure it ran all the way to the jail. I'm like high 90% that I left it running all the way to the jail so it could record our conversation all the way to jail. Because he was really upset about the arrest at the time.

**DET. COREY DAVIDSON:** Would you have turned that, turned that entire video in?

**DEP. ANDY COX:**   Yes, yes, the entire video gets downloaded. I don't modify it in any way, shape or form. It goes from three minutes back when I turned on my blue lights to when I usually shut it off. Generally I leave my video's on when transporting, unless there's an issue with running out of video or something like that. Um

**DET. COREY DAVIDSON:**   At that time was it a tape or did it go onto a memory card or DVD?

**DEP. ANDY COX:**   I'm pretty sure at that time I had the new camera. The Digital Ally where you take the video part out of the camera, plug it into the computer and burn it to a DVD. Um, I completed an arrest report, even that's on the video that's on Youtube, including my language. I notified my supervisor. I let him know about the use of force. I didn't try to downplay the use of force. I didn't try to hide the video, it's what I did. Um and there was a reason I did it.

**DET. COREY DAVIDSON:** Could you have deleted that video and not turned it in?

**DEP. ANDY COX:**   That would have been wrong, no.

**DET. COREY DAVIDSON:** But could you have done that?

**DEP. ANDY COX:**   Absolutely, because I don't, I'm not doing that. If I do something I'm going to man-up and take it.

**DET. COREY DAVIDSON:** It doesn't go anywhere but in your car is that correct?

**DEP. ANDY COX:**   That's correct. I followed the state statute in reference to the arrest at the time, um the thing about a concealed weapons permit, it wasn't concealed and he didn't notify me about it until after he was already on the ground. From his body language, what transpired, everything at that point he could have told me pretty much anything and I wasn't gonna believe it. Just because of the fact he had a firearm, he was squared off with me, in my mind he was ready to use it. So, I still would have continued on even if I believed that he had a concealed weapons permit but I did not believe him at the time. I just didn't because I have never had anybody in 22 years of law enforcement with a concealed weapon act the way he acted.

**DET. COREY DAVIDSON:** Prior to that interaction, prior to him leaning into the car, to the best of your recollection, did he ever tell you that he had a permit?

**DEP. ANDY COX:** He never told me he had a permit

**DET. COREY DAVIDSON:** Like I said, he wasn't required to do that

**DEP. ANDY COX:** Right, he never told me but his hand movements just everything about it, that's why I had my gun at a ¾ draw. Because I didn't like the way he was moving. It wasn't normal.

**DET. COREY DAVIDSON:** Andy, is there anything else you would like to add?

**DEP. ANDY COX:** I don't think so.

**DET. COREY DAVIDSON:** Do you have any questions?

**DEP. ANDY COX:** None

**DET. COREY DAVIDSON:** The time now is 9:36am